AO 91 (Rev. 11/11) Criminal Complaint

AUSA Stephen Chahn Lee (312) 353-4127

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**FILED**

7-28-14

JUL 2 8 2014

THOMAS G BRUTON
CLERK, U S DISTRICT COURT

UNITED STATES OF AMERICA

v.

DIANA JOCELYN GUMILA

CASE NUMBER:
**UNDER SEAL**

**14 CR 411**

MAGISTRATE JUDGE KIM

**CRIMINAL COMPLAINT**

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Beginning no later than 2011 and continuing until the present, at Schaumburg, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 1347 | knowingly and willfully participating in a scheme to defraud a health care benefit program, namely, Medicare, and to obtain, by means of false and fraudulent representations, money under the control of Medicare in connection with the delivery of or payment for health care services, and, in execution of the scheme, on or about July 24, 2013, did knowingly cause to be submitted a false claim, specifically, a claim that home health services provided to Patient ES qualified for payment because the patient was confined to the home |

This criminal complaint is based upon these facts:

_X_  Continued on the attached sheet.

FORREST JOHNSON
Special Agent, Federal Bureau of Investigation (FBI)

Sworn to before me and signed in my presence.

Date: July 28, 2014

_Judge's signature_

City and state: Chicago, Illinois

YOUNG B. KIM, U.S. Magistrate Judge
*Printed name and Title*

NITED STATES DISTRICT COURT )
                                               )       ss
NORTHERN DISTRICT OF ILLINOIS )

## AFFIDAVIT

I, Forrest Johnson, being duly sworn, state as follows:

## I.    **BACKGROUND OF AFFIANT**

1.      I am a Special Agent with the Federal Bureau of Investigation. I have been so employed since approximately June 2010.

2.      As part of my duties as an FBI Special Agent, I investigate criminal violations relating to white collar crime, including health care fraud. Through my training and experience, I have become familiar with the methods by which individuals and entities conduct health care fraud and the tools used in the investigation of such violations, including consensual monitoring, surveillance, data analysis, and conducting interviews of witnesses, informants, and others who have knowledge of fraud perpetrated against Medicare. I have participated in the execution of multiple federal search warrants. Along with other federal agents, I am responsible for the investigation of DIANA JOCELYN GUMILA and others associated with Suburban Home Physicians d/b/a Doctor At Home.

## II.   **BASIS AND PURPOSE OF AFFIDAVIT**

3.      This affidavit is submitted in part for the limited purpose of establishing probable cause to support a criminal complaint charging that beginning no later than 2011 and continuing until the present, DIANA JOCELYN GUMILA did knowingly and willfully participate in a scheme to defraud a health care benefit program, namely, Medicare, and to obtain, by means of false and fraudulent representations, money under the control of Medicare in connection with the delivery of or payment for health care services, and, in execution of the scheme, on or about July

1

24, 2013, did knowingly cause to be submitted a false claim, specifically, a claim that home health services provided to Patient ES qualified for payment because the patient was confined to the home, in violation of Title 18, United States Code, Section 1347.

4.      This affidavit is further submitted in part for the limited purpose of establishing probable cause to support applications for the issuance of warrants to search three locations, specifically, (1) the office of Suburban Home Physicians (doing business as Doctor At Home) located at 830 E. Higgins Road, Suites 112, 113A, and 113B, Schaumburg, Illinois, which I will refer to as the "**Subject Company Premises**," (2) the office of Xpress Mobile Imaging located at 890 E. Higgins Road, Suite 148, Schaumburg, Illinois, which I will refer as the "**Subject Xpress Premises**, and (3) the residence of DIANA JOCELYN GUMILA located at 24 Clover Circle, Streamwood, Illinois, which I will refer to as the "**Subject Residence**," each of which is further described in the following paragraphs and in the respective application's Attachment A and which will collectively be referred to as the **Subject Premises**.  As set forth below, there is probable cause to believe that in the **Subject Premises** there exists evidence of (1) violations of the federal health care fraud statute (Title 18, United States Code, Section 1347) in connection with a scheme to defraud a federal health care benefit program through the submission of false claims, including those for medically unnecessary services and (2) violations of federal statutes prohibiting false statements relating to health care matters (Title 18, United States Code, Section 1035) in connection with false statements relating to patients' qualifications for medical services.

5.      This affidavit is further submitted in part for the limited purpose of establishing probable cause to support an application for a warrant to seize certain funds which constitute or are derived from proceeds traceable to the receipt of violations of Title 18, United States Code,

Section 1347 and which are maintained in the financial accounts identified in an account at American Chartered Bank in the name of Suburban Home Physicians and ending with the digits 8410 (the "**Subject Account**"), which is described more fully in the respective application.

6.     The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts.  Because this affidavit is being submitted for the limited purposes set forth above, I have not included each and every fact known to me concerning this investigation.

## III.    SUMMARY OF INVESTIGATION

7.     Law enforcement officials have interviewed seven former employees of Suburban Home Physicians (doing business as Doctor At Home), as well as a current employee who called law enforcement in January 2014.  These employees include the following:

- Physician D, who worked at Doctor At Home for several weeks in October 2013 and made a recording of a meeting with GUMILA and others that is described below;

- Individual F, who worked at Doctor At Home for approximately three months in 2013, first as a medical assistant who went on patient visits, then in the department that processed home-health certification orders for home health agencies;

- Individual G, who worked at Doctor At Home for approximately seven months in 2013, first as a nursing assistant who went on patient visits and then

3

an office supervisor at the company's office at the **Subject Company Premises**;

- Individual H, who worked at Doctor at Home for approximately 15 months as a physician's assistant; and

- Individual I, a physician's assistant who has worked at Doctor at Home for more than a year and is a current employee.

8. Law enforcement officials have also reviewed emails that were provided by Physician D and also by Individual G. Physician D also provided additional materials to law enforcement.

9. Law enforcement officials have also reviewed an audio recording provided by Physician D of an October 2013 meeting in which GUMILA discussed the company's practices with Physician D. As described below, in the meeting, Physician D said that several patients did not qualify for certain services, and GUMILA responded by telling Physician D that she was an "artist" who should "paint the picture" in a way that Medicare would accept.

10. Law enforcement officials have also reviewed and analyzed claims data that was downloaded from the Services Tracking, Analysis, and Reporting System database, which is maintained by the Centers for Medicare and Medicaid Services.

11. Law enforcement officials have also reviewed patient files that were provided to the government pursuant to subpoena as well as patient charts that were provided to the government by Physician D.

12. Agents also have interviewed several patients and physicians that patients identified as their primary-care physicians.

13.     Based on checks of criminal-history databases, none of the individuals who have been interviewed and whose statements are described below have any felony convictions or any convictions involving false statements or dishonesty. Several former employees, including Individual F, Individual G, and Individual H may have a financial interest in the government's investigation. No promises have been made to any witnesses about criminal exposure.

## IV.    MEDICARE BACKGROUND INFORMATION

14.     Medicare is a health care benefit program within the meaning of 18 U.S.C. § 24(b). Medicare provides free or below-cost healthcare benefits to certain eligible beneficiaries, primarily persons sixty-five years of age or older. Individuals who receive Medicare benefits are often referred to as Medicare beneficiaries.

15.     Medicare consists of four distinct parts, two of which are relevant here. Part A provides for home health care, and Part B provides supplementary medical insurance for physician services, outpatient services, and certain home health and preventive services.

16.     Centers for Medicare and Medicaid Services, a federal agency within the United States Department of Health and Human Services, administers the Medicare program. CMS contracts with public and private organizations, usually health insurance carriers, to process Medicare claims and perform administrative functions. CMS currently contracts with National Government Services, Inc. to administer and pay Part B claims from the Medicare Trust Fund. The Medicare Trust Fund is a reserve of monies provided by the federal government. NGS processes Medicare Part B claims submitted for physicians' services for beneficiaries in multiple states including Illinois.

17.     Enrolled providers of medical services to Medicare recipients are eligible for reimbursement for covered medical services.  By becoming a participating provider in Medicare, enrolled providers agree to abide by the rules, regulations, policies, and procedures governing reimbursement, and to keep and allow access to records and information as required by Medicare.

18.     Providers of health care services to Medicare beneficiaries seeking reimbursement under the program must submit a claim form, which is a CMS 1500, with certain information regarding the Medicare beneficiary, including the beneficiary's name, health insurance claim number, date the service was rendered, location where the service was rendered, type of services provided, number of services rendered, the procedure code (described further below), a diagnosis code, charges for each service provided, and a certification that such services were personally rendered by that provider.

19.     The American Medical Association has established certain codes to identify medical services and procedures performed by physicians, which are collectively known as the Current Procedural Terminology system.  The CPT system provides a national correct coding practice for reporting services performed by physicians and for payment of Medicare claims. CPT codes are widely used and accepted by health care providers and insurers, including Medicare and other health care benefit programs.

20.     Medicare pays for home health services only if a Medicare patient qualifies for coverage of home health services and if the services are "reasonable and necessary," according to the Medicare Benefit Policy Manual (Chapter 7, Section 20).

6

21.     Home health services are billed to Medicare in 60-day increments known as "episodes." Each episode requires its own certification by the physician who has ordered nursing services. To certify a patient, a physician must sign a form entitled, "Home Health Certification and Plan of Care," which is sometimes referred to as a "Form 485." In signing a Form 485, a physician certifies or recertifies the following

> I certify/recertify that this patient is confined to his/her home and needs intermittent skilled nursing care, physical therapy and/or speech therapy or continues to need occupational therapy. The patient is under my care, and I have authorized the services on this plan of care and will periodically review the plan.

### A.     Confined to the Home

22.     To qualify for Medicare coverage of home health services, a patient must be, among other things, "confined to the home." That term is defined in the Medicare Benefit Policy Manual (Chapter 7, Section 30).[1]

23.     Prior to November 19, 2013, the Medicare Benefit Policy Manual defined a patient as being "confined to the home" if the patient had a "normal inability to leave home and, consequently, leaving home would require a considerable and taxing effort."

24.     As of November 19, 2013, the Medicare Benefit Policy Manual was revised so that a person is not to be considered confined to the home unless both of the following two criteria are met:

- First, the patient must either (a) because of illness or injury, need the aid of supportive devices such as crutches, canes, wheelchairs, and walkers; the use of special transportation; or the assistance of another person in order to leave their place of residence, OR (b) have a condition such that leaving his or her home is medically contraindicated.

---

[1]     The definition is available online at http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/bp102c07.pdf

- Second, there must exist a normal inability to leave the home, AND leaving home must require a considerable and taxing effort.

25.     To "illustrate the factors used to determine whether a homebound condition exists," the Medicare Benefit Policy Manual both before and after November 19, 2013 gave the following examples of patients who would be considered confined to the home:

- "A patient paralyzed from a stroke who is confined to a wheelchair or requires the aid of crutches in order to walk"

- "A patient who is blind or senile and requires the assistance of another person in leaving their place of residence"

- "A patient who has lost the use of their upper extremities and, therefore, is unable to open doors, use handrails on stairways, etc., and requires the assistance of another individual to leave their place of residence"

- "A patient who has just returned from a hospital stay involving surgery who may be suffering from resultant weakness and pain and, therefore, their actions may be restricted by their physician to certain specified and limited activities such as getting out of bed only for a specified period of time, walking stairs only once a day, etc."

26.     According to the Medicare Benefit Policy Manual, "[t]he aged person who does not often travel from home because of feebleness and insecurity brought on by advanced age would not be considered confined to the home for purposes of receiving home health services" unless that person had a condition like one of those quoted in the paragraph above.

27.     The Medicare Benefit Policy Manual recognizes that patients can leave their home and still be considered confined to the home, but only if the absences are "infrequent or for periods of relatively short duration," or are "attributable to the need to receive health care treatment." According to the Medicare Benefit Policy Manual, "[i]t is expected that in most instances, absences from the home that occur will be for the purpose of receiving health care

8

treatment," though "occasional absences from the home for nonmedical purposes … would not necessitate a finding that the patient is not homebound if the absences are undertaken on an infrequent basis or are of relatively short duration and do not indicate that the patient has the capacity to obtain the health care provided outside rather than in the home."

**B.** **Skilled Nursing Services That Are Reasonable and Necessary**

28.     Under the Medicare Benefit Policy Manual (Chapter 7, Section 20), if a Medicare patient is confined to the home and meets the other criteria for home health services, such a patient is "entitled by law to coverage of "reasonable and necessary home health services." Medicare reimbursement for home health services is not authorized for services and treatment that were not "reasonable and necessary" or for which a patient did not meet the criteria necessary to justify the claimed service or treatment.

29.     Under the Medicare Benefit Policy Manual (Chapter 7, Section 40.1.1), skilled nursing services are necessary "only when (a) the particular patient's special medical complications require the skills of a registered nurse or, when provided by regulation, a licensed practical nurse to perform a type of service that would otherwise be considered non-skilled; or (b) the needed services are of such complexity that the skills of a registered nurse or, when provided by regulation, a licensed practical nurse are required to furnish the services." Such a service "must be so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel as provided by regulation."

30.     If the nursing services are not necessary, or if the nursing services could "safely and effectively be performed by the patient or unskilled caregivers," then such services should not be paid for by Medicare and should not be billed to Medicare, according to the Medicare

9

Benefit Policy Manual (Chapter 7, Section 40.1.1). "If a service can be safely and effectively performed (or self-administered) by an unskilled person, without the direct supervision of a nurse, the service cannot be regarded as a skilled nursing service although a nurse actually provides the service ... A service is not considered a skilled nursing service merely because it is performed by or under the supervision of a nurse."

31.     The Medicare Benefit Policy Manual gives some examples of situations where skilled nursing services may or may not be appropriate. According to the Medical Benefit Policy Manual, "giving a bath does not ordinarily require the skills of a nurse and, therefore, would not be covered as a skilled nursing service." The Medicare Benefit Policy Manual also states that skilled nursing visits may be appropriate to help educate a patient who has been "newly diagnosed" with diabetes mellitus.

32.     In addition, the Medicare Benefit Policy Manual (Chapter 7, Section 40) explains when skilled nursing services would be appropriate in the following conditions:

- Observation and assessment of a patient by a nurse is reasonable and necessary only "where there is a reasonable potential for change in a patient's condition that requires skilled nursing personnel to identify and evaluate the patient's need for possible modification of treatment or initiation of additional medical procedures." Such observation and assessment can continue "until the patient's clinical condition and/or treatment regimen has stabilized."

- Management and evaluation of a patient's care plan is reasonable and necessary only "where underlying conditions or complications require that only a registered nurse can ensure that essential unskilled care is achieving its purpose." The complexity of the unskilled services that are "a necessary part of the medical treatment" must require skilled nurses "to promote the patient's recovery and medical safety in view of the patient's overall condition."

- Teaching and training activities can be reasonable and necessary "where the teaching or training is appropriate to the patient's functional loss, illness, or injury." At the same time, teaching and training should not go on indefinitely, and would "cease to be reasonable and necessary" if it "becomes apparent

10

after a reasonable period of time that the patient, family, or caregiver will not or is not able to be trained."

## V.    DOCTOR AT HOME BACKGROUND

33.    According to the company's website (http://www.drathome.com, last visited on June 25, 2014), "Doctor at Home is a physician-based organization providing health care exclusively to patients in their home." Doctor At Home's services include "monthly health check-up and follow up."

34.    According to interviews with former employees and a current employee, including Individual H and Individual I, Doctor At Home sends physicians and physician's assistants to visit patients at their homes. Physicians and physician's assistants are accompanied by a medical assistant, who drives the physician or physician's assistant to each visit and takes patients' vital signs.

35.    According to Individual F, who worked in 2013 in a department overseeing the processing of forms ordering home health agencies to provide nursing services to patients, Doctor At Home gets many of its patients from home health agencies. According to Individual F, home health agencies refer patients to Doctor At Home so that a physician will sign a form ordering the home health agency to provide nursing services to the patient.

36.    Doctor At Home's website also markets directly to home health agencies. According to the website, "we have a complete insight and understanding of the new Medicare regulations and how they affect your Home Health Agency and our company … We at DOCTOR AT HOME understand the new rules imposed on you by Medicare and we're here to help … We also understand all the data and information that Medicare requires of Home Health Agencies in order to assure that they get reimbursed."

11

37.     According to the Illinois Department of Financial and Professional Regulation's online database, GUMILA is a registered nurse in Illinois and received her license in 1991.

38.     Several witnesses, including Individual G and Individual F, said that DIANA JOCELYN GUMILA manages the company's operations.

39.     According to a 2010 electronic-funds transfer agreement, GUMILA's husband, Individual A, identified himself as the president of Suburban Home Physicians d/b/a Doctor At Home.

## VI.     SUMMARY OF INVESTIGATION

40.     As described in more detail below, according to interviews with former employees, interviews with a current employee, interviews with patients, a review of claims data, a review of emails, and a review of a recording made by a former employee, Suburban Home Physicians d/b/a Doctor At Home has engaged in multiple fraudulent practices:

41.     First, Doctor At Home physicians have signed orders falsely certifying patients as being confined to the home and requiring home health services. By having such orders signed, Doctor At Home assists home health agencies that bill Medicare for services for which patients do not qualify as well as for services that are not medically necessary. In return, Doctor At Home receives patient referrals from the home health agencies. As described below, GUMILA has approved the signing of orders even when she knew that no Doctor At Home physician had seen the patient in more than five months. In addition, GUMILA has overruled at least one physician who determined that her patients were not confined to the home. GUMILA was recorded telling this physician that the physician was an "artist" who could make patients look

on paper as if they were confined to the home even when the patients can leave their homes. *See* Section VII below.

42.     Second, Doctor At Home schedules patient visits on a monthly basis rather than based on patient need, and bills most of its patient visits to Medicare as if the visits were complicated and involved complex medical decision-making, even though they are routine in nature and short in duration. *See* Section VIII below.

43.     Third, Doctor At Home has double-billed many patient visits to Medicare, billing the same visit as a "patient visit" and also as a "wellness visit," even though the provider has done nothing to warrant the double billing. *See* Section IX below.

44.     Fourth, Doctor At Home has submitted false claims to Medicare indicating that physicians and physician's assistants are providing extensive oversight of patients' home health services. Such claims are justified if the patient is receiving "complex or multi-disciplinary care modalities" that "require[] ongoing physician involvement in the patient's plan of care." In fact, employees in the Philippines prepare these oversight claims in part by counting routine visits towards oversight, and some providers said that they have not provided such oversight. *See* Section X below.

45.     Fifth, Doctor At Home has billed for tests that are not medically necessary. *See* Section XI below.

## VII.   DOCTOR AT HOME PHYSICIANS AND EMPLOYEES FALSELY CERTIFY THAT PATIENTS ARE CONFINED TO THE HOME AND NEED HOME HEALTH SERVICES

### A.   Doctor At Home Physicians Have Certified More than $20 Million in Home Health Services from 2013 to May 2014

46.     According to claims data, from 2013 through May 2014, more than 300 home health agencies have submitted claims to Medicare claiming that they were ordered by just four

13

Doctor At Home physicians to provide home health services to approximately 4,000 patients. Those home health agencies were paid more than $20 million as a result of their claims.

47.     According to claims data submitted by home health agencies to Medicare, one Doctor At Home physician alone, Physician C, has ordered home health services for more than 2,000 patients that have cost Medicare more than $12 million in payments to home health agencies. As described below, one employee has described Physician C as simply signing every form placed in front of him without reviewing them, and Physician C signed forms ordering home health services for patients that no one at Doctor At Home had seen in several months.

48.     Based on interviews of former employees, a current employee, and the primary-care physicians of several patients, many patients have been certified by Doctor At Home physicians as confined to the home and requiring home health services when they did not qualify for such services.

49.     For example, one patient who was certified for home health services multiple times was Patient LA.  According to Doctor At Home claims data, Physician B and other physicians at the company have certified this patient for home health services a total of at least nine times from May 2011 through February 2013.  According to claims data, a home health agency has been paid approximately $27,026 for those services.

50.     Agents interviewed Patient LA's primary-care physician for the past two years, including part of the period in which she was being certified for home health services.  Patient LA's primary-care physician said that he sees Patient LA at his office every three to four months. He said that Patient LA does not have any acute conditions that would require any extra medical care.  He said that Patient LA uses a walker but is able to walk for limited distances and is

14

healthy enough to leave her home to go shopping and to go to medical appointments, among other things. He said that Patient LA would not qualify for home health services because her health is stable and because she has had no recent changes or acute diseases. He said that he was not aware that she was receiving nursing care at her home or home visits by another physician.

51.     Another patient who has been certified for home health services multiple times was Patient EH. According to Doctor At Home claims data, Physician B and Physician E have certified this patient for home health services three times in 2013. According to claims data, a home health agency has been paid approximately $9,756.12 for such services.

52.     Agents interviewed Patient EH in person on July 2014. Agents tried to find Patient EH one morning, but did not speak with her until later that day. Patient EH explained that she had been out at the grocery store when agents had come by earlier. Patient EH said that she first got nursing services three or four years ago when she was discharged after a hysterectomy. Patient EH said that she was confined to her home after the surgery but regularly leaves her home now. She said that the nursing services now are just for her "wellness," unlike the services she received after her surgery. Patient EH said that a nurse comes once a week, checks her vital signs, and checks her medications.

53.     As discussed below, a physician at Doctor At Home tried to discharge Patient EH from nursing services, but was overruled by GUMILA.

**B.     Individual I**

54.     Individual I is a physician's assistant who has worked at Doctor At Home for more than a year and currently works there. Based on a check of criminal-history databases, Individual I does not have any felony convictions or any convictions involving false statements

15

or dishonesty. Prior to being contacted by law enforcement, Individual I contacted law enforcement in January 2014 with a complaint about Doctor AT Home.

55. Individual I said that most of her patients were able to leave their home without difficulty. She said that she has complained about visiting patients who are not homebound. According to Individual I, when she has refused to see a patient because she believes the patient is not homebound, the patient is transferred to another physician or physician's assistant within Doctor At Home.

56. Individual I said that she has confronted GUMILA and others at Doctor At Home about patients being certified for home health services and getting home visits from Doctor At Home. She said that she talked to GUMILA about this in the fall of 2013, shortly after she heard about criminal charges brought against individuals at another company that provides similar doctor visits to patients at their homes, Mobile Doctors.

57. According to Individual I, GUMILA led a meeting in the fall of 2013 to address employees' concerns about similarities between Doctor At Home and Mobile Doctors, another home-visiting company whose head was arrested in August 2013 on fraud charges.[2] In that meeting, GUMILA provided a handout that purported to provide Medicare guidelines for when a patient could be confined to the home.

58. Individual I said that she asked GUMILA about patients not being homebound at the meeting. According to Individual I, GUMILA said that a patient qualified as homebound if

_____

[2] On August 30, 2013, the head of Mobile Doctors, Dike Ajiri, and a doctor working there, Dr. Banio Koroma, were arrested on charges that involved allegations that Ajiri had directed that patient visits be billed to Medicare at higher levels than justified and that Dr. Koroma had falsely certified patients as confined to the home and qualifying for home health services. The case, *United States v. Ajiri* (13 CR 685), is now pending before District Judge John J. Tharp Jr.

16

the patient had knee pain or nausea, even if the nausea was only temporary. According to Individual I, GUMILA said that if a person had a cane in the house, that person could be considered homebound even if the person did not use the cane on a regular basis to walk around.

59.     Individual I said that GUMILA was also asked about how patients who had stable conditions could qualify for skilled nursing services. According to Individual I, GUMILA said that nursing services could be ordered for patients if the patients were lonely or needed company.[3]

60.     Individual I said that she has recommended discharging patients who she did not believe were homebound, but her recommendations have been overruled. Individual I said that since the fall of 2013, she has marked in patients' charts when she did not believe that a patient was homebound. According to Individual I, GUMILA told Individual I to stop doing that and said that Individual I's patients were indeed homebound as per the findings of a Doctor At Home physician. Individual I said that she now puts in patients' charts that the patients were homebound pursuant to a supervising physician at Doctor At Home when she believes that the patients are not in fact homebound.

61.     Individual I was asked by law-enforcement officials in early July 2014 to review a copy of the Medicare Benefit Policy Manual's definition of confined to the home. After reviewing this, she said that this was very different from what she was told by GUMILA at the fall 2013 meeting. She also said that less than half of her patients at Doctor At Home were "confined to the home" based on the Medicare Benefit Policy Manual's definition.

_____

[3]     I am not aware of anything in the Medicare Benefit Policy Manual which authorizes a physician to order nursing services that are covered by Medicare because a patient is lonely or needs company.

62.     For example, Individual I identified Patient MM as a patient who had some medical conditions that were stable and who did have a cane but was able to leave the home on a regular basis. Individual I said that she did not believe that Patient MM was confined to the home. According to claims data, Physician C has ordered seven episodes of home health services for Patient MM, and a home health agency has been paid approximately $23,335.40 for such services.

63.     Individual I said that she received a call recently from Physician B and Individual P, who is the office manager of Doctor At Home's office in Schaumburg. According to Individual I, Physician B complained about Individual I putting in charts that a patient was homebound as per him. Individual I said that she told Physician B that if he ever saw her patients, he would know that the patients were not homebound, and that she would not put into charts that patients were homebound when she did not think they were. According to Individual I, the office manager (Individual P) replied that Physician B knew the Medicare guidelines. Individual I said that she replied that the guidelines were clear and that simple knee pain did not mean that a patient was homebound.

**C.     Physician D**

64.     Physician D is a physician who worked for Doctor At Home for several weeks in the fall of 2013. Based on a check of criminal-history databases, Physician D does not have any felony convictions or any convictions involving false statements or dishonesty. While working at Doctor At Home, Physician D spoke to law enforcement in connection with another investigation. During that interview, Physician D informed law enforcement that she had concerns about the practices at Doctor At Home.

18

65.     Physician D told law-enforcement officials that Doctor At Home had many patients who she did not believe were confined to the home, and that she was not allowed to discharge those patients. She said that she had put into the company's electronic medical records system instructions to discharge many patients, that those instructions were quickly removed from the system, and that she was told by GUMILA and others that some of her discharge orders were overruled by GUMILA.

66.     Physician D provided photographs of the notes that she had entered into the system for multiple patients whom she said that she had seen in October 2013 and whom she believed were not confined to the home or did not need skilled nursing services. Of those, according to claims data submitted by the home health agencies, Physician B and Physician C authorized home health services for at least four patients subsequent to Physician D's visit.

67.     For example, according to Physician D, Patient ML is not homebound. Physician D provided a photograph of the note that she entered into the company's electronic-medical records system, which stated as follows:

> Patient seen today for routine follow up visit. Complains of back pain for several years. Doing his own grocery every week and takes bus. Has his PCP at Northwestern who he see[s] anytime he needs. No chest pain, no shortness of breath. Exercise in Gym 2 times per week. Patient use[s] walker usually but doesn't like to do it often. Patient has an appointment with orthopedic surgeon next month so they will decide about possible surgical treatment. There is no other changes in plan and treatment set up by his PCP and Orthopedic surgeon. Patient stable, compliant with medications. Patient complains of a lot of back pain. Having good tan skin. Probably outside every day.

68.     Nonetheless, according to claims data, Patient ML was receiving home health services at the time of Physician D's visit, as ordered by Physician C, and continued to receive services afterwards.

69.     Physician D also provided notes to agents showing that she had described another patient, Patient ZS, as "fully ambulatory" and as not qualifying for receiving home visits. Physician D provided a photograph of the October 2013 note that she entered into the company's electronic-medical records system, which stated as follows:

> Patient is 68 y/o male seen today for initial visit. History of hypertension for the last ten years. Initially poorly controlled secondary to patient not compliance with treatment plan and medications. Recently bp wnl. Patient is three years after prostate surgery and doing well. No complications no urinary incontinence and PSA is low. Was told by the physician in hospital that his knees pain is possibly sec[ondary] to osteoarthritis but did not have any diagnostic study done. Pain is mild and occurs occasionally and patient takes 1-2 tablets of over the counter pain medications. Patient is fully ambulatory and doesn't qualify for Home Visiting physician at this time. Please, discharge from services.

70.     Nonetheless, according to claims data submitted by a home health agency, Physician C ordered home health services for this patient beginning the day after Physician D's visit, even though there is no claims data indicating that Physician C has ever visited the patient.

71.     In addition, law enforcement has reviewed the version of Physician D's note for Patient ZS in Doctor At Home's records, which was provided to law enforcement pursuant to an administrative subpoena to Doctor At Home's electronic medical records provider. The note reflects editing subsequent to Physician D's photograph. Significantly, the note obtained via subpoena describes the patient as "ambulatory" but drops "fully," and the language stating that the patient did not qualify for a home-visiting physician and the language ordering the patient's discharge were deleted.

72.     Physician D said that her orders to discharge several patients were overruled by GUMILA in three specific examples in October 2013.

73.    For example, Physician D provided law enforcement with handwritten notes that she made on or about October 10, 2013, in which she wrote that she had tried to discharge Patient TB because she was seen "coming back from shopping," was "not homebound," and had a mental condition that was stable. According to Physician D as well as the notes she provided to law enforcement, GUMILA called Physician D the next day and said that the patient qualified for services because of her mental condition, that GUMILA would remove the discharge orders, and that GUMILA and Physician D would talk about the company's policies the following week.

74.    In addition, Physician D said that she tried to discharge Patient EH and Patient ER. According to her notes, Patient EH saw her primary-care physician every month and was "ambulatory," and Patient ER also saw her primary-care physician and was not confined to the home. Physician D also provided to law enforcement an October 12, 2013 email in which an individual located in the Philippines wrote that Patient EH and Patient ER would not be discharged as per GUMILA's orders. According to the email, the individual wrote, "We have placed Skilled Nursing and Homebound status for [Patient EH and Patient ER]. As per Ma'am Jocelyn [GUMILA] both are with psychiatric disorders and can be considered homebound."[4]

### D.    Recording of GUMILA Meeting with Physician D

75.    Physician D also provided law enforcement with a recording that she made of an October 2013 meeting which she had with GUMILA, her husband (Individual A), and Physician B and which Physician D recorded. According to Physician D, GUMILA requested the meeting in response to Physician D's attempts to discharge patients. According to Physician D and the

---

[4]    At various places in this affidavit, I have included my interpretations of statements and documents, which are marked with brackets and which are based on my knowledge of the investigation, including interviews of witnesses, as well as my training and experience.

recording, GUMILA claimed that patients qualified for home health services even if they regularly visited their primary-care physicians. When Physician D asked how specific patients such as Patient EH could qualify for home health services, GUMILA did not explain how and instead told Physician D simply to describe patients in ways that Medicare would not question.[5]

76. According to the recording, at the beginning of the meeting, GUMILA said that she wanted to teach Physician D about the company's processes and protocols because the doctor had been trying to dismiss 95 percent of the patients that the doctor had seen. GUMILA also introduced Physician B, whom GUMILA said was the company's "medical director" and described as having done "home visits for decades."

77. GUMILA said that patients did not have to be "bedbound" to qualify for nursing services so long as they were "homebound." Physician B agreed, and said that there must be a "considering and taxing effort to leave the house." Physician B added that a patient with depression could be homebound if the patient "can't leave the home."

78. Physician D then asked Physician B if a patient would be considered homebound if the patient had been taking medications for depression for years, was in stable condition, and did not show any symptoms. "Is she homebound or not?" Physician D asked. Physician B did not answer, and instead GUMILA said, "Our goal is to maintain patients at their home." GUMILA said that Doctor At Home's visits were to prevent patients from going to the hospital.

---

[5] Physician D said that she made the recording because she thought the meeting would provide training that she wanted to be able to review it at a later time. Physician D said that the other participants in the meeting did not know that she was recording. Physician D made the recording soon after telling law enforcement about her concerns about Doctor At Home but was not asked by law enforcement to take any action at Doctor At Home or make any recordings there. The portions of the recording included in this affidavit are based on draft, not final transcripts of the recording.

GUMILA said that Doctor At Home's goal was to "save government money," and said that Doctor At Home's visits cost $80 and were "much cheaper than admitting this patient at $5,000 to $10,000 each ER occurrence admission."

79.     In fact, Doctor At Home's practices cost Medicare much more than $80 a month. First, as discussed below, most of Doctor At Home's visits are billed to Medicare as if they were complicated, with the average payment for most visits approximately $120.    Second, as discussed below, Doctor At Home has double-billed many patient visits and has billed Medicare for oversight based in part on the visits, costing Medicare approximately $80 more each month. Third, Doctor At Home regularly bills Medicare for certifying patients, costing Medicare another $30 to 40 per patient each time.   Fourth, by certifying patients for home health services when they are not confined to the home, Doctor At Home assists home health agencies in falsely billing Medicare, thus causing Medicare to pay more than $1,000 a month on many patients simply so a nurse can visit once a week and conduct a basic check of the patient's condition. Altogether, Doctor At Home's practices and processes regularly causes Medicare to pay more than $1,250 a month for basic maintenance of many patients who do not need such services.

80.     For example, Doctor at Home has caused Medicare to pay more than $14,000 on claims for Patient EH, one of the patients whom Physician D said was not confined to the home and who has been interviewed in person by agents (see paragraphs 51, 52, and 74 above).  The following table breaks down the approximate costs that Doctor At Home has caused Medicare to pay to Doctor At Home, Xpress Mobile Imaging and a home health agency regarding Patient EH from January 2013 through May 2014:

| Payments | Total Approximate Amount | Notes |
|---|---|---|
| Payments to home health agency | $9,756.12 | Physician D said that the patient was not confined to the home when seen in October 2013. Patient EH said that she was confined to the home in the past but not for at least the past year. |
| Payments to Doctor At Home for home visits, including 12 billed as if so complicated that they typically would take 60 minutes | $2,065.16 | Patient EH said that the doctor visits were routine and about 20 minutes long. She said that the doctor checks her vital signs and refills her medication. Patient EH said that she was able to see her primary-care physician in her office. |
| Payments to Doctor At Home for oversight of care by home health services that require "complex and multidisciplinary care modalities" | $1,031.52 | Patient EH said that the nursing services she receives are routine in nature and typically involve checking her vital signs and her medications. See Section X. |
| Payment to Doctor At Home for tests relating to patient's balance | $597.51 | Patient EH said that she did recall a test relating to her balance and that she was told only that she failed. See Section XI. |
| Payments to Mobile Xpress Imaging for tests | $313.40 | Doctor At Home and Mobile Xpress Imaging transfer money between their bank accounts, and employees in the Philippines recommend that such tests be ordered if the physician does not order them. See Section XI. |
| Payment to Doctor At Home for duplex scan | $132.20 | This is one of several tests that employees in the Philippines recommend if the physician does not order. See Section XI |
| Payment to Doctor At Home for certifying patient for home health services | $113.46 | Physician D said that the patient was not confined to the home when seen in October 2013, and Patient EH said that she was confined to the home in the past but not for at least the past year. |
| Payments to Doctor At Home for counseling patient to stop smoking | $117.05 | Patient EH said that she is trying to quit smoking on her own and has gotten no counseling other than being told about some gum that she cannot use because she does not have top teeth. |
| TOTAL | $14,126.42 | |

24

81.     By contrast, the physician whom Patient EH considers her primary-care physician has seen the need for only four office visits during the time that Doctor At Home has also been seeing Patient EH, and received only $260.32 in payments for such services. The primary-care physician has also ordered only $40.42 in tests in that time.

82.     According to the recording, Physician D went back to her question about depression.  She asked Physician B again if a patient who had depression but was taking medication and was stable would be homebound.  Physician B did not provide an answer. Instead, GUMILA said that the patient would be homebound under "Medicare guidelines" depending on how the physician documented the patient's condition.  GUMILA said, "It's up to a provider how to paint the picture of that patient.  So, no one can question that."  GUMILA said that the patient would qualify because the patient's decision making was not "100 percent" compared to a person who had not been diagnosed with such a condition.  GUMILA said that she had looked at guidelines and saw nothing wrong with saying that such a patient was homebound. "It's up to a provider like I said on how you would like to paint the picture," she said.

83.     In fact, as stated above, the definition of being confined to the home, or homebound, for purposes of qualifying for home health services is about the person's ability to leave the home, not about whether the person has "100 percent" decision making.

84.     According to the recording, Physician D then asked specifically about Patient TB. Physician D said that the patient was sick and had multiple life-threatening conditions, but added that the patient was "mobile" and was "going outside everywhere everyday to, um, for visit to different doctors."  In her chart, Physician D wrote that she had met Patient TB when the patient was "coming back from grocery shopping with very heavy bags of groceries" after walking three

blocks from the train station. Physician D wrote in her chart the Patient TB had no complaints about any problems, had no chest pain, and had no shortness of breath, and just wanted a refill of her medications.

85.     According to the recording, GUMILA did not address Physician D's notes about how she had met Patient TB or reconcile this with Patient TB being considered confined to the home. Instead, GUMILA listed some of the patient's diagnoses and said that if she was a Medicare auditor, she would question Physician D for discharging Patient TB given her conditions. Physician D replied that the patient goes to see a primary-care physician and a specialist, and thus did not need to be seen by a home-visiting physician as well. GUMILA acknowledged that 99 percent of Doctor At Home's patients had primary-care physicians, but said that "Medicare" allowed Doctor At Home to conduct home visits "to save money for the government." GUMILA repeated, "It's maintenance," and said that "this is why Medicare allows home visits."

86.     Medicare does allow home visits and does pay for physicians to conduct home visits. However, under the Medicare Benefit Policy Manual, a physician must document in the medical record for the visit "the medical necessity of the home visit made in lieu of an office or outpatient visit."[6] In order words, if a patient can go to a physician's office, then a home visit may be medically unnecessary and thus should not be billed to Medicare at all.

87.     According to the recording, Physician D asked Physician B if he thought discharging Patient TB was malpractice. Physician B said that it depended on how often the patient was actually seen by her primary-care physician. He added that he asked patients when

---

[6]     This chapter is available online at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/clm104c12.pdf

they last saw their primary-care physician and that some said that they had not seen their primary-care physician in more than a year.

88. In fact, many of Physician B's patients have been able to make office visits more regularly than Physician B claimed. Of the 15 patients that Physician B certified for home health services more than twice between February 2013 and May 2014, 12 had at least two office visits during that time, and three had more than 15 office visits, according to claims data. For example, Physician B certified Patient JT for home health services three times, even though Patient JT made 17 office visits from February 2013 through March 2014, according to claims data.

89. According to the recording, Physician D told Physician B that Patient TB was seeing her primary-care physician frequently because she has prescriptions, and asked Physician B if he was concerned about a liability issue if the patient was discharged. Physician B did not provide an answer. Instead, GUMILA said that Medicare auditors would "only look at what you put in this paper," referring to a hard-copy printout of a patient chart, and said that Medicare would only "look at your patient" if they received complaints from the patients themselves.

90. In fact, Medicare auditors regularly look at patterns of billing, and do conduct examinations of Medicare providers who engage in unusual patterns of billing.

91. According to the recording, GUMILA told Physician D that she was "hurting" Doctor At Home by discharging patients, and told Physician D that if she thought a patient should be discharged, Physician D should tell the office manager and the office manager would have Physician B review.

27

92.     GUMILA also told Physician D that discharging a patient like Patient TB would "put us more on a liability side," because someone might think that Doctor At Home was discharging the patient because the company did not want to "deal with her," rather than thinking that the patient did not qualify. "This patient qualifies. Why are we not giving them the benefits they're entitled for?" GUMILA asked. "We're not doing anything illegal."

93.     Physician D then asked GUMILA about Patient EH, one of the patients who has been interviewed in person by agents (see paragraphs 51, 52, 74, 80 and 81 above). In her chart, Physician D had written that the patient was "doing well, [had] no chest pain, [had] no shortness of breath," was "compliant with her medications," "sees her [primary care physician] every month and usually drives there by herself," and was "able to walk 3-5 blocks daily." GUMILA did not address Physician D's description and did not explain how the patient was "confined to the home" when she could walk and drive. Instead, GUMILA read aloud some of the patient's diagnoses, and said that the patient qualified.

94.     Physician D complained that she had put more information about Patient EH into her chart, but that her notes had been taken out of the chart. According to the recording, GUMILA replied, "Yes, we wanted to," and was then Physician D interrupted GUMILA by asking why someone had changed her note. GUMILA replied that she had told employees to change the note.

95.     GUMILA then turned to Patient LG. In her chart, Physician D had written that Patient LG had "no chest pain" or "shortness of breath," could "walk couple of blocks daily," and "doesn't qualify for services." GUMILA acknowledged that the patient chart showed that the patient had a "normal gait," but did not explain how the patient was "confined to the home"

28

when the patient walked daily. Instead, GUMILA told Physician D that it depended on "how you paint the picture." GUMILA then told Physician D, "Remember. You're painting. You're an artist."

96.     Physician D complained that the reason why she discharged Patient LG had been taken out of the chart. GUMILA replied, "We needed to close out the chart."

97.     Physician D then turned to another patient, Patient BJ. According to Physician D's chart, the patient had multiple conditions, but did not complain of chest pain or shortness of breath, had not suffered any recent falls, had not needed any recent emergency-room visits or hospital stays, and saw her primary-care physician every two months and her cardiologist every three months.

98.     According to the recording, GUMILA did not explain how the patient was "confined to the home." Instead, GUMILA said that whenever Physician D charted that a patient had all systems normal, one of Doctor At Home's quality-assurance nurses called GUMILA to ask if the patient should be discharged. GUMILA said that Doctor At Home's nurses follow Medicare guidelines and they would discharge patients from skilled nursing if the patients do not qualify. "It's how you paint the picture on this patient. You could say she's got knee pain, back pain, and all that, but you could also say on the other hand, well she's walking two blocks." GUMILA said. GUMILA then asked if Physician D had actually seen the patient walk two blocks and said that if she had seen the patient walk two blocks, the patient would not be walking normally afterwards. GUMILA then said that she had difficulty walking two blocks and implied that she herself could be considered homebound. GUMILA stated, "It's up to you how you

29

going to paint the picture of me." GUMILA continued, "You going to paint the picture of me. Now that's going to be up to you as a provider how you paint your picture."

99.     Physician D reiterated that she had discharged Patient BJ because the patient saw a primary-care physician regularly. GUMILA did not explain how Patient BJ was "confined to the home," but replied that Physician D was trying to "deprive" the patient of something they had a "right to" under Medicare. Physician D replied that many patients do not understand what is going on and that many patients incorrectly believe that Doctor At Home worked with the patients' primary-care physicians and were sent by the primary-care physicians. GUMILA indicated that Doctor At Home was primarily a "supplemental" service.

100.    Towards the end of the meeting, GUMILA encouraged Physician D to not put her notes into the company's electronic medical records system if she thought a patient was not homebound, and told her to do those notes on paper and to have them reviewed by Physician B. Physician D told law-enforcement that she agreed to do this because she thought it would be easier to make copies of her notes which could not be altered by the employees in the Philippines.

101.    Physician D told law enforcement that she quit Doctor At Home the next business day. Claims data shows that Physician D's last patient visit for Doctor At Home was the day that she identified as her last day.

E.    **GUMILA Authorized Orders For Patients Who Were Not Confined to the Home**

102.    As discussed below, Doctor At Home uses employees in the Philippines to review home-health certification orders which are prepared by home health agencies for a Doctor At Home physician to sign. Such orders make it appear that a physician at Doctor At Home ordered

the home health agency to begin nursing services for a patient on a specific date. As discussed below, GUMILA has authorized the signing of such orders even when she has known that no Doctor At Home physician saw the patient around the time that they allegedly ordered services and that no such physician ordered the home health agency to provide services until after the home health agency asked for such an order.

103.    Individual F worked for Doctor At Home for approximately three months in 2013. During that time, she oversaw the company's department which processed home-health certification forms, which are sometimes known as Form 485's. Individual F contacted law enforcement about some concerns about Doctor At Home in the summer of 2013, prior to being contacted by law enforcement.

104.    According to Individual F, home health agencies send home-health certification forms to Doctor At Home, and employees in the company's "485 department" review and process the forms.

105.    According to Individual F, Doctor At Home's procedure is to have a physician sign every home-health certification order for a patient so long as Doctor At Home had seen the patient within a certain time period. According to Individual F, the period was based on the "start of care" date designated by the home-health agency on the Form 485. According to Individual F, under Doctor At Home's 90/30 day rule, the company could have a physician sign a Form 485 whenever a physician or physician's assistant saw the patient within 90 days before or 30 days after the home health agency wanted to start care.

106.    Based on my training and experience, and my knowledge of Medicare regulations, Doctor At Home's 90/30 day rule appears to be based on Medicare's requirement

31

that a physician conduct a face-to-face encounter with every patient whom he or she has certified for home health "no more than 90 days prior to the home health start of care date or within 30 days after the start of care." Under Medicare rules, payment is conditioned upon such an encounter occurring and documentation of such an encounter.

107. However, that Medicare requirement does not allow a nursing agency to provide skilled nursing services and then seek a physician's order afterwards, as occurred in some instances described further below. Based on my training and experience, I believe that Doctor At Home's 90/30 day rule is designed in part to ensure that Doctor At Home can use a patient visit to provide documentation that a home health agency needs for payment.

108. According to Individual F, if there had not been a patient visit fitting within the 90/30 day period, then Individual F brought this to the attention of GUMILA. According to Individual F, GUMILA made the final decision as to whether a 485 would be given to a physician to sign in these circumstances. Individual F said that GUMILA explained that Doctor At Home would make an exception to its normal practice and explained that it would do so for certain home health agencies. Individual F said that such exceptions were common and did not recall any instance where GUMILA refused to have a Form 485 presented to a physician to be signed.

109. Individual F's explanation was corroborated by a 485 department employee during the October 18, 2013 meeting recorded by Physician D. In that meeting, Physician D raised a concern about a 485 that she was asked to sign because it indicated that she had ordered services before she even began working at Doctor At Home. GUMILA then called the employee in the Philippines to describe what the 485 department does with each Form 485. The employee

32

via speaker phone then explained that the 485 department reviewed each Form 485 to make sure that the name, date of birth, diagnoses, medications were consistent with Doctor At Home's records and that there had been a visit around the date when services allegedly had been ordered to begin. The employee added that if there had not been a visit around the date when services allegedly had been ordered to begin, the 485 department would consult GUMILA.

110.    Individual F, who oversaw the 485 department for approximately two months in 2013, said that many home-health certification forms were given to Physician C to sign. According to Individual F, she sat with Physician C as he signed forms once a week, and he signed the forms without reviewing any charts. Individual F said that she helped Physician C flip pages so that he could sign the forms as quickly as possible.

111.    According to Individual F, if a physician did sign the 485, the physician left the date blank, and Individual F then backdated the form, usually by picking the first Friday within the period for which the doctor had allegedly ordered care.

112.    According to Individual F, if a physician or physician's assistant informed the office that a patient was not confined to the home, then GUMILA had the patient seen by another physician or physician's assistant, usually Physician B. Individual F also said that if a doctor did not sign a Form 485 because the patient was not confined to the home, the Form 485 would be sent to another physician to sign.

113.    As discussed below, on June 13, 2013, GUMILA sent emails authorizing the signing of 485's even when she knew that no one at Doctor At Home had ordered the services in advance and when there was no basis for anyone to know whether the patient was confined to the

33

home.[7] Specifically, on June 13, 2013, GUMILA ordered that 485's for two separate patients be signed authorizing services that had already occurred even though Doctor At Home had not seen the patients for at least five months. In fact, both of these patients told agents that they could walk and leave the house in the summer of 2013.

114.    According to Individual F, who was interviewed about both occasions, these were not unusual occurrences.

### 1.    <u>Patient JR</u>

115.    In one instance on June 13, 2013, GUMILA ordered via email that a 485 be signed ordering services for Patient JR starting a month earlier even though no doctor had seen the patient in six months.

116.    On June 13, 2013, Individual F sent the following email to GUMILA:

> I received a 485 for [Patient JR] with cert periods 04/13/13-06/11/13. This patient was recently seen on 06/12/13 and prior to that date he was not seen since 12/13/12. I called the HH [home health agency] and spoke with Jackie to tell them that because we hadn't seen the patient 90 days prior or 30 days after the beginning of the cert period. Moments later I received a call from the administrator Jessica. She was very irate, stating that the patient not being seen during that time was our fault and either the document gets signed or she will and I quote "pull all of the mutual patients from [Home Health Agency X] and [Home Health Agency Y]" away from us. After a little research I found that the patient was seen on 12/13/12, we called on 12/14 to see how the visit went and no answer a voicemail was left, called on 01/26 to schedule appt with no answer and voicemail was left, we called again on 01/28 and spoke with wife Ruthie who confirmed appt for 02/12. On 02/11 wife Ruthie called to re-schedule appt for 02/15, and on 02/15 the patient called and cancelled the appt. This is all information I have been able to locate. How should I proceed with this Ma'am?

---

[7]    These emails were among hundreds provided to law enforcement by Individual G, who supervised Doctor At Home's Illinois office in 2013.

117. According to Individual F, she recalled this incident because the home health agency had demanded that Doctor At Home have the 485 signed and because she was involved in checking patient records herself.

118. GUMILA responded a few hours later in an email, writing that a physician should sign the 485 order for the home health agency even though no one had seen the patient ahead of time and even though no one at Doctor At Home would sign a face-to-face encounter form explaining why the patient was confined to the home:

> Tell her we will sign it but we will not be able to give them a f2f encounter [face-to-face encounter form] for those days since we didn't see the patient. Ask the hh agency [home health agency] to assist us in seeing the patientif (sic) we don't sign the 485 the hh agency will not get paid. But since this didn't meet criteria of 90/30 day rule, when their hh gets auditted - medicare will just retract the money from the hh agency. Not from us. Since the hh agency cant and will not be able to produce f2f notes. But we don't need to tell the hh agency that part. Its up to them - since the usually interpret and make their own rules.

119. According to Individual F, GUMILA did not review any patient files before authorizing the 485 either in this instance or in others.

120. According to claims data, Home Health Agency W billed Medicare for services for Patient JR beginning April 13, 2013 through June 11, 2013 and was paid approximately $1,629.04 for such services. According to claims data, the services were authorized by Physician C.[8]

---

[8] According to an online Medicare provider database, Home Health Agency X, which was referred to in the email quoted in paragraph 116 does business as the same name as Home Health Agency W. In addition, according to a review of claims data, Home Health Agency X and Home Health Agency W have provided services to several common patients, which I believe based on my training and experience to be a practice in which home health agencies transfer patients in order to provide care to patients for longer periods while trying to avoid raising red flags with Medicare.

35

121.    Agents interviewed Patient JR in person in June 2014. Patient JR said that he was an avid walker and walked three to four blocks a day in the summer of 2013. He also said that he has normally driven himself to the VA Hospital for medical appointments until the spring of 2014 when he had to undergo surgery. When asked, Patient JR said that he did not believe that he was confined to the home.

### 2.    Patient ES

122.    In another instance on June 13, 2013, GUMILA authorized a 485 for Patient ES be signed as a "favor" to the home health agency even though no doctor had authorized the services beforehand.

123.    According to an electronic note regarding Patient ES dated June 12, 2013, which was provided to law enforcement pursuant to subpoena, an employee at Doctor At Home "received a call from [an individual] at [Home Health Agency Z] following up on the 485 for episode 05/14/2013 to 07/12/2013." According to the note, the employee informed the Home Health Agency Z individual that "the patient needs to be seen first because the last visit was" in January 2013.

124.    On June 13, 2013, Individual F sent an email asking GUMILA if Doctor At Home could sign the requested Form 485 authorizing home health services for Patient ES from May 2013 to July 2013, even though Individual F informed GUMILA that the patient had not been seen since January 2013. According to the email, "Patient has not been seen since 01/29/13. Can we sign this 485? We only saw the patient twice. 01/15/13 initial visit with AY and 01/29/13 sick visit again with AY."

125.     GUMILA replied in an email that day that usually Doctor At Home did not sign 485 orders for a home health agency if an employee had not seen the patient or had not seen the patient within 90 days preceding the start of care or 30 days within the start of care, but staff should "EMAIL ME with those cases." GUMILA continued:

> At times, we make exception and sign the 485 [Doctor At Home would sign a Form 485 even while knowing that no physician had seen the patient within the required period and thus had no documentation of a face-to-face encounter]. But we need to reiterate to the hh agency that we will not be able to give them the F2F for we didn't have any visits. So – you can ask the hh agency to assist us scheduling the patient and assist us so we can see the patient for a visit.
>
> Again, call hh [Home Health Agency Z] and let them know we will sign the 485 – WE CAN DO THEM A FAVOR.
>
> BUT WE CANT GIVE F2F because we didn't see the patient within 90 days before may 14 (which should have been ANTHING AFTER March 14) AND 30 DAYS AFTER 5/14- WHICH IS 6/14- WHICH IS TOMORROW.

126.     According to an electronic note dated the next day, June 14, 2013, which was provided to law enforcement pursuant to subpoena, an employee at Doctor At Home then "spoke with [an individual] at [Home Health Agency Z] regarding 485 sent with cert periods 05/14/2013 to 07/12/2013."

127.     In providing a Form 485 to Home Health Agency Z, a Doctor At Home physician certified that the patient was confined to his home. As discussed below, Patient ES said that he was able to walk around at that time, as did his primary-care physician. In providing a Form 485 to Home Health Agency Z, a Doctor At Home physician also certified that the patient was under his care, even though Doctor At Home did not see the patient since January 2013 and Patient ES did not consider anyone at Doctor At Home to be his primary-care physician. In providing a

37

Form 485 to Home Health Agency Z, a Doctor At Home physician stated that he had ordered the home health agency to provide such services beginning in May 2013, when no such order was given until the home health agency asked for one in June 2013.

128.     According to claims data, on or about July 24, 2013, Home Health Agency Z billed Medicare for the period from May 2013 through July 2013 and was paid $2,025.03 for such services for Patient ES. Moreover, Home Health Agency Z has billed Medicare for home health services for Patient ES from January 2013 continuously into January 2014, and has been a total of approximately $12,651.57 for such services. According to claims data, Physician C authorized all such services.

129.     Doctor At Home has also billed for several certifications by Physician C regarding Patient ES. From January 2013 through March 2014, Doctor At Home billed Medicare for five such certifications and received a total of $181.71 in payment on such claims. For example, on or about October 23, 2013, Doctor At Home submitted a claim to Medicare claiming that Physician C had certified Patient ES for home health services on or about July 13, 2013, and was later paid $34.24 on this claim.

130.     Agents interviewed Patient ES as well as his primary-care physician in June 2014. Patient ES, who is in his early 50s, said that he occasionally has episodes with his back and episodes where he cannot get around as well as he can normally, but is able to walk around and get to his car. He identified his primary-care physician and said that he visits her at her office every three months. Patient ES said that he did not know why he had a doctor visit him at his house, and said that the visits have not provided any real benefit to him.

131.    Patient ES's primary-care physician identified herself as such and said that she has been so for three or four years, including in the summer of 2013. Patient ES's primary-care physician said that she sees Patient ES every three or four months, and that she does not consider him to be homebound. Patient ES's primary-care physician said that she was not comfortable with another doctor seeing Patient ES at his home. She said that if she had believed that Patient ES needed home health services, she would have handled the referral herself.

## VIII.  DOCTOR AT HOME FALSELY CLAIMS THAT PATIENT VISITS ARE MORE COMPLICATED THAN THEY ACTUALLY ARE

### A.    Billing for Visits with Established Patients

132.    The American Medical Association has established CPT codes for home visits with new and established patients. According to the American Medical Association's coding manuals, since 1998, home visits with new patients are billed using CPT codes 99341 through 99345, and home visits with established patients are billed using CPT codes 99347 through 99350. Higher CPT codes within the 99341-99345 range and the 99347-99350 range indicate visits of a more complicated nature.

133.    Specifically, according to the American Medical Association's annual Current Procedural Terminology manuals, since 1998, a home visit with an established patient is billed based on three key components: (1) the extent of the patient history that the physician takes during the visit, (2) the extent of the examination performed by the physician during the visit, and (3) the medical decision making done by the physician, which refers to the "complexity of establishing a diagnosis and/or selecting a management option."

134.    According to the CPT manuals, medical decision making is measured by: (1) "the number of possible diagnoses and/or the number of management options that must be

39

considered," (2) "the amount and/or complexity of medical records, diagnostic tests, and/or other information that must be obtained, reviewed, and analyzed," and (3) "the risk of significant complications, morbidity, and/or mortality, as well as comorbidities, associated with the patient's presenting problems(s) (sic), the diagnostic procedure(s), and/or the possible management options." The table below is from the Centers for Medicare and Medicaid Services' Evaluation and Management Services Guide, and summarizes what is involved with each kind of medical decision making.

| TYPE OF DECISION MAKING | NUMBER OF DIAGNOSES OR MANAGEMENT OPTIONS | AMOUNT AND/ OR COMPLEXITY OF DATA TO BE REVIEWED | RISK OF SIGNIFICANT COMPLICATIONS, MORBIDITY, AND/OR MORTALITY |
|---|---|---|---|
| Straightforward | Minimal | Minimal or None | Minimal |
| Low Complexity | Limited | Limited | Low |
| Moderate Complexity | Multiple | Moderate | Moderate |
| High Complexity | Extensive | Extensive | High |

135. According to the American Medical Association's annual Current Procedural Terminology manuals, since 1998, for a home visit with an established patient to be billed properly under CPT code 99347, it must have at least two of the following key components:

- A problem focused interval history [the patient's condition since the last visit]

- A problem focused examination

- Straightforward medical decision making

40

136.    According to the CPT manuals, a home visit that qualifies for CPT code 99347 "usually" involves a problem or problems that are "self limited or minor."  According to the manual, "Physicians typically spend 15 minutes face-to-face with the patient and/or family."

137.    According to the CPT manuals, since 1998, for a home visit with an established patient to be billed properly under CPT code 99348, it must have at least two of the following key components:

-    An expanded problem focused interval history

-    An expanded problem focused examination

-    Medical decision making of low complexity

138.    According to the CPT manuals, a home visit that qualifies for CPT code 99348 "usually" involves a problem or problems that are "of low to moderate severity."  According to the manual, "Physicians typically spend 25 minutes face-to-face with the patient and/or family."

139.    According to the CPT manuals, since 1998, for a home visit with an established patient to be billed properly under CPT 99349, it must have at least two of the following characteristics:

-    A detailed interval history

-    A detailed examination

-    Medical decision making of moderate complexity

140.    According to the CPT manuals, a home visit that qualifies for CPT code 99349 "usually" involves a problem or problems of "moderate to high severity."  According to the manual, "Physicians typically spend 40 minutes face-to-face with the patient and/or family."

41

141.    According to the CPT manuals, since 1998, for a home visit with an established patient to be billed properly under CPT code 99350, it must have two of the following characteristics:

-    A comprehensive interval history

-    A comprehensive examination

-    Medical decision making of moderate to high complexity

142.    According to the CPT manuals, a home visit that qualifies for CPT code 99350 "usually" involves a problem or problems of "moderate to high severity."  According to the manual, "The patient may be unstable or may have developed a significant new problem requiring immediate physician attention.  Physicians typically spend 60 minutes face-to-face with the patient and/or family."

143.    Medicare payments on claims under CPT codes 99347 and 99348 generally are less than the payments on claims under CPT codes 99349 and 99350.  The table below is based on the CPT manuals and summarizes the requirements and typical characteristics of established-patient visits that are correctly billed using CPT codes 99347 through 99350, along with the approximate fees paid for such visits in the Chicago area in 2013.

| CPT code | Interval history or examination | Medical decision making | Typical problem | Typical amount of time | Approximate fees for Chicago (2013) |
|---|---|---|---|---|---|
| 99347 | Problem focused | Straightforward | Self limited or minor | 15 | $58.94 |
| 99348 | Expanded problem focused | Low | Low to moderate severity | 25 | $88.91 |
| 99349 | Detailed | Moderate complexity | Moderate to high severity | 40 | $134.45 |

42

| CPT code | Interval history or examination | Medical decision making | Typical problem | Typical amount of time | Approximate fees for Chicago (2013) |
|---|---|---|---|---|---|
| 99350 | Comprehensive | Moderate to high complexity | unstable patient or significant new problem requiring immediate physician | 60 | $187.70 |

### B. Data and Witness Summary

144. According to claims data submitted by Doctor At Home to Medicare, most visits with established patients are complicated and qualify for the 99350 level. From 2011 through May 2014, approximately 93% of all established-patient visits were billed at the highest or second-highest levels (CPT 99350 and 99349), with approximately 59% billed at the highest level (CPT 99350). For services billed from August 2013 through May 2014, Doctor At Home was paid approximately $1,322,696 on established-patient visits billed at the two highest levels.

145. Physician D, Individual F and Individual I said that visits at Doctor At Home with established patients were classified either as "follow-up" visits or as "sick" visits." According to Individual F and Individual I, follow-up visits were scheduled based on Doctor At Home's company policy, not based on the patient's request or complaint. Sick visits were scheduled based on a request by a patient or a home health agency. Visits with new patients were classified as "new patient" visits and generally were longer than visits with established patients.

146. For example, Individual I, a current physician assistant, said that most of her visits were follow-up visits and were typically 15 to 25 minutes long. She said that a visit with an established patient usually consisted of "the basics," such as a medical exam, a review of the patient's medications, and a review of the patient's vital signs. She said that few of her visits

43

were responses to actual patient complaints or involved complicated medical decision making. However, according to claims data, approximately 94 percent of her established patient visits were billed to Medicare at the 99349 or 99350 level, with 44 percent billed at the 99350 level.

147.    Individual I provided examples of multiple patients who were not confined to the home and whose visits were routine in nature and short in duration. For example, Individual I said that all of her visits with Patient MM were the same and were no longer than 20 minutes in duration. She said that the visits were not complicated because the patient's conditions were stable and because there were no new problems or complaints. Of the 14 patient visits by Individual that were billed by Doctor At Home to Medicare, half were billed at the highest level, indicating a complicated visit typically taking about 60 minutes, and the other half at the second-highest level, indicating a complicated visit typically taking about 40 minutes.

148.    Individual I said that she once was allowed to select the billing code for her patient visits. According to Individual I, once Doctor At Home switched to electronic medical records in 2013, she was not able to select a billing code for her visits, and the system was set so that each visit was automatically coded at the second-highest level. She said that she tried to change the billing codes to lower levels, but was not able to do so.

149.    Individual I also said that she had recently received a call from Individual P, who is the office manager for Doctor At Home's Illinois office. According to Individual I, Individual P said that Individual I could not say that a patient's condition was "stable" in the patient charts and that she should refrain from using that word. Individual I said that she replied that she would not lie about a patient's condition, and asked why she should not use the word "stable" when

44

appropriate. According to Individual I, Individual P said that if Individual I used the word "stable," there would be no reason in the chart for the company to justify seeing the patient.

150. Individual I said that Physician B called her recently as well to complain about her charting. According to Individual I, Physician B said that she was not adding enough patient complaints to the charts. Individual I said that she told Physician B that she was not going to make up patient complaints. According to Individual I, Physician B replied that she needed to document a level 3, 4 or 5 visit (referring to higher-complexity billing codes) and that she needed to talk about ailments. According to Individual I, Physician B explained that a level 1 or 2 (referring to low-complexity visit codes) did not pay as much.

151. Physician D, who worked for Doctor At Home for about three weeks in late 2013, also said that most of her visits were follow-up visits, that "sick" visits were rare, and that most visits were "simple" and about 15 minutes long because the patients' conditions were stable. By contrast, according to claims data, approximately 91 percent of her established-patient visits were billed to Medicare at the highest level, as if they were so complicated that the visits typically would take 60 minutes. When asked if this sounded right to her, Physician D expressed surprise at the billing.

152. Similarly, Patient EH, whom Physician D saw once in October 2013 and tried to discharge, told agents that Doctor At Home's visits with her were routine in nature. She said that the doctor checked her vitals and went over her prescriptions, and that the visits were usually 20 minutes in duration. By contrast, claims data shows that 12 out of the 14 established-patient visits from March 2013 through April 2014 were billed to Medicare at the highest level, as if they were so complicated that the visits typically would take 60 minutes. The other two were

45

billed at the second-highest level, as if they were complicated enough that the visits typically would take 40 minutes.

153.    Emails provided by Individual G to law enforcement also show that most patient visits are classified as "follow up" visits, rather than as "sick visits." For example, according to an email sent to GUMILA on August 9, 2013, Physician B was scheduled to see 12 patients on August 7, 2013, with all of them classified as follow-up visits rather than as new patient visits or as "sick visits." Similarly, according to the same report, Physician B was scheduled to see 13 patients on August 8, with only one of them categorized as a "sick visit" and nine categorized as "follow up visits." Nonetheless, Doctor At Home billed all of the visits that Physician B did those days as medically necessary and complicated in nature. Specifically, Doctor At Home billed 14 of the visits from those days at the most-complicated level (99350) and billed two others at the second most-complicated level (99349).

154.    The following table shows the number of sick, new, follow-up patients for providers from August 5 through August 9, 2013. As seen below, more than 80 percent of all of the visits that week were "follow up" visits rather than "sick visits." Moreover, when excluding the new patient visits, about 94 percent of all established-patient visits were "follow up" visits rather than "sick visits."

| Provider | New patient visits | Sick visit | Follow up visit |
|---|---|---|---|
| Physician B | 13 | 2 | 35 |
| Physician C | 6 | 1 | 24 |
| Physician E | 11 | 5 | 44 |
| Individual H | 0 | 2 | 43 |
| Individual I | 4 | 3 | 50 |
| Individual J | 4 | 0 | 37 |
| Individual K | 5 | 3 | 52 |

46

| Provider | New patient visits | Sick visit | Follow up visit |
|---|---|---|---|
| Individual L | 0 | 1 | 36 |
| Individual M | 5 | 6 | 45 |
| **Total** | **48** | **23** | **366** |
| % of all visits | 11% | 5% | 84% |
| % of established-patient visits | | 6% | 94% |

155.    Doctor At Home's billing thus indicates that physicians are spending more time with patients and having more complicated visits than they actually are.

156.    For example, Doctor At Home's billing data for Physician C suggests that he spent more than 14 hours with patients on July 10, 2013. According to claims data, all 13 established-patient visits that he did that day were complicated enough to be billed at the highest level and each typically would have taken an hour with each patient. In addition, Physician C saw one new patient, which was billed at the highest level for a new-patient visit, which typically corresponds to about 75 minutes with a patient.

157.    In fact, Physician C was scheduled to do mostly "follow-up" visits with patients that day and worked less than seven hours that day. Emails sent to GUMILA show that Physician C started his workday at 7:52 a.m., was expected to spend about an hour and 39 minutes total in transit between patients, and was done by 2:49 p.m. Accordingly, Physician C had about 30 minutes on average to see each patient, assuming that he did not eat lunch or take any breaks that day.

158.    According to Individual F, she accompanied multiple physicians and physician's assistants on their patient visits for about three weeks and served as their medical assistant during this time. According to Individual F, a physician or nurse typically saw about 8 or 9 patients a day and the typical visit was about 15 to 20 minutes long. According to Individual F, a typical

47

visit would begin with her checking the patient's vital signs as a medical assistant. The physician or physician's assistant then conducted an exam that usually lasted about five minutes. According to Individual F, the rest of the visit was spent on paperwork.

159. Another former employee, Individual G, said that he accompanied physicians and nursing practitioners on patient visits for about a month in March 2013. According to Individual G, the entire visit lasted about 15 to 20 minutes. During the visit, Individual G checked the patient's vital signs and recorded the patient's medications. The physician or physician's assistant also evaluated the patient and discussed any complaints the patient might have.

160. Individual G also said that he and others who worked in the company's office regularly received complaints from patients, and that the most common complaint was that a patient said that they have received an Explanation of Benefit form from Medicare showing that they had received a 60 minute visit when the visit had only been about 15 minutes long. Medicare typically sends patients a form showing what services had been billed to and paid by Medicare. Such forms would show that Doctor At Home has billed its patient visits at high levels.

## IX. DOCTOR AT HOME HAS DOUBLE BILLED VISITS AS ESTABLISHED-PATIENT VISITS AND AS WELLNESS VISITS

161. According to the Medicare Benefit Policy Manual, Medicare allows providers to provide and bill for "annual wellness visits" with Medicare patients once a year in order to promote health and to encourage patients to obtain screening and preventive services. An annual wellness visit "will include the establishment of, or update to, the individual's medical/family history, measurement of his/her height, weight, body-mass index (BMI) or waist circumference,

48

and blood pressure," according to the Medicare Benefit Policy Manual. Such claims are billed using CPT code G0438.

162. According to an analysis of approximately 4,555 G0438 claims from 2011 through May 2014, approximately 96 percent of them occurred on the same day, with the same patient, and with the same physician or physician's assistant as a new-patient visit or established-patient visit for which Doctor At Home was paid by Medicare. According to a publication by the American Medical Association, a provider can bill Medicare for an evaluation and management service for the same visit as an annual wellness visit, but only if there is a portion of the visit that is medically necessary to treating the patient's illness or injury.[9]

163. For example, according to a review of claims data, Individual I conducted approximately 281 patient visits from January 2013 through May 2014 that were billed twice, once as a new or established patient visit, and also as a wellness visit. Individual I said that she was familiar with wellness visits based on a job prior to working at Doctor At Home, and that she did not do any wellness visits at Doctor At Home. When asked if she recalled doing anything different in some visits that would justify billing a visit with a patient both as a typical patient visit and as a wellness visit, she said that she did not.

164. When asked if she had done a wellness visit for Patient MM in March 2014, as indicated by Doctor At Home's claim to Medicare, Individual I said that she did not recall doing anything different in that visit that would warrant billing the visit as a wellness visit. In fact, Individual I's March 2014 visit with Patient MM was billed to Medicare both as a visit using

---

[9] This publication, The ABCs of Providing the Annual Wellness Visit (January 2014), is available online at http://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/AWV_Chart_ICN905706.pdf

CPT code 99349 and as a wellness visit, and Doctor At Home was paid a total of $189.64 between the two visits.

165.    Similarly, according to a review of claims data, Physician D conducted approximately 20 patient visits in October 2013 that were billed twice, once as a new patient visit, and also as a wellness visit.  Physician D said that she did not do any wellness visits while working at Doctor At Home.

166.    According to claims data, Doctor At Home has been paid approximately $585,000 in payments on G0438 claims, with approximately $279,199 paid on such claims with services dates of August 1, 2013 through May 2014.

## X.    DOCTOR AT HOME HAS EMPLOYEES IN PHILIPPINES PREPARING CLAIMS FALSELY INDICATING THAT PHYSICIANS ARE PROVIDING OVERSIGHT OF PATIENTS' HOME HEALTH SERVICES

167.    According to the Medicare Benefit Policy Manual, Medicare allows for health-care providers to bill when they supervise services for a patient "receiving complex and/or multidisciplinary care as part of Medicare-covered services provided by a participating home health agency."  Such services can include "regular physician development and/or revision of care plans; review of subsequent reports of patient status; review of related laboratory and other studies; communication with other health professionals not employed in the same practice who are involved in the patient's care; integration of new information into the medical treatment plan; and/or adjustment of medical therapy."  Such services do not include time associated with discussions with the patient, time spent by staff getting or filing charts, or travel time.

168.    According to the Medicare Benefit Policy Manual, oversight services are eligible for payment only if certain requirements are met, including the following:

- The beneficiary must require complex or multi-disciplinary care modalities requiring ongoing physician involvement in the patient's plan of care;

- The care plan oversight (CPO) services should be furnished during the period in which the beneficiary was receiving Medicare covered HHA or hospice services;

- The physician who bills CPO must be the same physician who signed the home health or hospice plan of care;

- The physician furnished at least 30 minutes of care plan oversight within the calendar month for which payment is claimed. … Low-intensity services included as part of other evaluation and management services are not included as part of the 30 minutes required for coverage.

169.    Providers use CPT code G0181 to submit claims for care plan oversight. According to an analysis of claims data from 2011 through May 2014, Doctor At Home has billed at least one G0181 claim for about 80 percent of its patients, and has billed more than 10 such claims for more than 1,400 patients. According to claims data, Doctor At Home has been paid approximately $3.48 million in payments on G0181 claims, with approximately $943,720 from August 1, 2013 through May 2014.

170.    For example, according to claims data, Doctor At Home has billed care plan oversight by Individual I, a current physician's assistant, approximately 1,722 times for more than 500 patients, and has been paid approximately $126,211.31 on such claims. This corresponds to more than 800 hours of care plan oversight.

171.    When asked how many of her patients required "complex or multi-disciplinary care modalities requiring ongoing physician involvement in the patient's plan of care," Individual I said that she did not think any of her patients did. Individual I was asked about one patient, Patient JW, for whom Doctor At Home has billed nine oversight claims to Medicare.

51

Individual I said that Patient JW was in stable condition and that she did not do anything between visits to oversee the patient's care.

172.   Similarly, Doctor At Home has billed Medicare for approximately 129 oversight claims by Physician D, including approximately 47 claims with service dates postdating her quitting the company. Physician D said that she did not provide any such oversight. In fact, Physician D said that she tried to discharge most of her patients from home health services in the time that she worked at the company.

173.   Individual F, who oversaw the 485 department for about two months in 2013, said that the oversight claims were created not by the physicians or physician's assistants who see the patients, but were created by employees in the 485 department in the Philippines and then sent to a biller in the Illinois office. She said that many employees in the Philippines reviewed patient charts and filled out "oversight forms," which recorded everything that had happened with a patient since the patient's last visit with a provider and that gave set times to be counted for billing purposes.

174.   According to Individual F, the employees who prepare the oversight forms just add up minutes corresponding to any activities performed by Doctor At Home employees. According to Individual F, one of the main components of the oversight form was the patient visit. According to Individual F, every visit with a patient was counted as 40 minutes on the oversight form, whether or not the visit actually took that long. Employees also counted any tests that they had ordered and any contact that they had with the patient or the patient's home health agency. The employees then sent the forms to a biller to process. According to Individual F, the 485 department completed an oversight form for a patient the day after every patient visit.

## XI.    UNNECESSARY TESTS

175.    As described below, Doctor At Home employees encourage physicians and physician's assistants to order tests that are billed either by Doctor At Home or by Xpress Mobile Imaging even when the physician and physician's assistant did not believe the tests were necessary. In particular, Doctor At Home has billed Medicare for thousands of eye-movement tests that some providers believe are medically unnecessary. Doctor At Home also has referred thousands of echocardiogram and ultrasound tests to Xpress Mobile Imaging, a company that has several ties to Doctor At Home.

### A.    Employees in the Philippines Recommend Physicians Order Certain Tests

176.    According to a review of emails provided by Individual G and Physician D, at least two employees in the Philippines who identified themselves as nurses sent emails in 2013 providing lists of patients that the nurses believed qualified for various echocardiogram or ultrasound tests, or for certain tests involving the measuring of eye movements which were referred to as "VAT tests."

177.    According to the email signature lines for each employee, each is a registered nurse who lists an address at the **Subject Company Premises**. Individual N's email signature indicates that she is in the VAT department and Individual O's email signature indicates that she is the "team leader" of the quality assurance department. In fact, each works in the Philippines and neither are licensed in Illinois to be a registered nurse.

178.    Based on the emails provided by Individual G and Physician D, the nurses appear to have reviewed patients' diagnoses only for tests that Doctor At Home or Xpress Mobile

Imaging billed to Medicare, and did not review for other tests that could benefit patients but would not result in additional payments to Doctor At Home or Xpress Mobile Imaging.[10]

179.    Based on a review of the employees' recommendations for tests for 31 patients, the employees recommended one or more kinds of x-ray tests whenever the patient had hypertension (usually a cardiac echocardiogram and a carotid duplex examination), and recommended a VAT test whenever the patient was said to use a cane or walker or had an abnormal gait.

180.    For example, in an October 15, 2013 email, Individual N sent Physician D a chart recommending tests for eight patients, including recommendations that Patient JF get an arterial examination, a cardiac echocardiogram, and a carotid duplex examination. This was a patient whom Physician D had visited five days earlier, whom Physician D had ordered discharged, and whom Physician D had described as "walking 12 stairs, walking 6-7 blocks every day," not having any chest pain or shortness of breath, and not having any mobility restriction preventing her from going to see a physician.

---

[10]    Based on a review of Doctor At Home emails, at least six employees who work for Doctor At Home (including Individual N and Individual O) represent themselves as a registered nurse (or "RN") in their email signatures, list the **Subject Company Premises** (specifically Suite 113A) as their address, and do not indicate that they actually work in the Philippines. None of them appear in the Illinois Department of Financial and Professional Regulation's online database of registered nurses. In the October 2013 recorded meeting, GUMILA acknowledged that the nurses in the Philippines do not have their own licenses and said that they "practice under my license." Illinois nursing law prohibits nurses who are not licensed in Illinois to practice nursing in Illinois unless they meet certain exceptions. Illinois nursing law prohibits anyone from employing unlicensed nurses from practicing in Illinois and also provides that a licensed nurse can be sanctioned if the nurse allows "another person … to use the licensee's license to deceive the public."

54

181.    Physician D said that when she got this email, she called the employee and asked why the employee was recommending the tests.  According to Physician D, the employee said that the tests were supposed to be ordered because GUMILA "said so."

182.    Physician D said that she did not order any of the tests that were listed in the email, and that she would have ordered them if she had thought they were medically necessary. Even so, Xpress Mobile Imaging billed Medicare for five tests for Patient JF performed on November 19, 2013, all of them ordered by another Doctor At Home physician.

183.    Physician D also provided law enforcement with a recording of a meeting that she had with Individual P, the office manager of the company's Illinois office, on the same day as Physician D's recorded meeting with GUMILA.  According to that recording, Physician D asked Individual P how the employee knew that a patient qualified for the tests that the employee had recommended.  Individual P explained that the employee followed a protocol to order tests based on the patient's diagnosis, age, and whether the patient had had prior tests.

**B.  Employees Have Added Diagnoses to Attempt Justifying Tests**

184.    Individual I, a current physician's assistant, said that employees in the Philippines had ordered tests under her name and have added diagnoses to her patient's charts which were not true in order to make tests appear to be medically necessary. For example, she saw once in the computer system that Individual N had added two diagnoses (hyperlipidemia and abnormal gait) to a chart for one of Individual I's patients.  Individual I called Individual N and asked why incorrect diagnoses had been added to the patient's chart.  According to Individual I, Individual N said that they sometimes had to add diagnoses in order to justify testing.

55

185. Individual I said that another employee raised a concern about diagnoses being added to patient files in the fall 2013 meeting held by GUMILA after charges were brought related to Mobile Doctors. According to Individual I, GUMILA dismissed the employee's concerns and suggested that the employee had forgotten about adding the diagnoses.

186. Individual I said that she told her patients that the office has ordered tests without her approval, and that patients should refuse to let anyone conduct a test on them unless she told them beforehand that it was being ordered.

### C. VAT Tests

187. Physician D asked GUMILA about the VAT tests during the October 2013 meeting that she recorded. Physician D asked how the company decided whether a patient needed the VAT test. Physician B replied that it was "multifactorial." GUMILA explained that there were two nurses who were specifically assigned to review all charts for patients who she said would qualify for a VAT test under Medicare. GUMILA said that the criteria included a history of falls, weakness, or use of an assistive device. According to GUMILA, the test would help determine if a patient was more prone to falling horizontally or vertically, and nurses could help educate patients on what to do.

188. A review of claims data for Doctor At Home shows that Doctor At Home bills for multiple tests that relate to patients' balance. One test involves "assessment and recording of abnormal eye movement with patient in rotating chair," another involves "use of vertical electrodes during eye or balance evaluation," a third involves "observation and recording from multiple positions of abnormal eye movements," and a fourth involves measuring eye movements. According to claims data, Doctor At Home has performed more than 6,000 tests

relating to the evaluation of patients' eye movements and been paid approximately $364,730 by Medicare on such tests.

189.    Individual I said that the VAT tests involve shaking a patient's head to evaluate their balance and that she thought these were unwise for patients who were elderly. Individual I said that she did not order any tests. According to claims data, Doctor At Home submitted claims indicating that Individual I had ordered approximately 130 such tests on approximately 26 separate patients, and was paid approximately $6,933 by Medicare for such tests.

190.    Individual H said that he told GUMILA that the VAT tests were not necessary but GUMILA ordered the tests anyway. According to claims data, Doctor At Home submitted claims indicating that Individual H had ordered approximately 250 such tests on approximately 50 separate patients, and was paid approximately $13,281 by Medicare for such tests.

191.    Patient EH, one of the patient whom Physician D tried to discharge in October 2013, told agents that she did recall doing a test involving shaking her head. Patient EH said that she was told only that the test had something to do with her balance and that she had failed. Doctor At Home billed Medicare for two sessions of such tests, once in February 2013 and again in August 2013, and was paid a total of $528.78 for such tests.

D. **Xpress Mobile Imaging**

192.    According to an analysis of claims data by Xpress Mobile Imaging from October 2013 through May 2014, Xpress Mobile Imaging has billed Medicare for approximately 3,228 claims from October 2013 through May 2014, and was paid approximately $261,806 on such claims. According to claims data, all but one of the claims had been ordered by a physician or physician's assistant who worked at Doctor At Home.

57

193.    According to claims data, the tests most often billed by Xpress Mobile Imaging to Medicare are complete transthoracic echocardiograms, duplex scans of extracranial arteries, and ultrasounds of arteries. Such tests were recommended by employees in the Philippines in the emails sent to Physician D and Individual H, as described above.

194.    Physician D said that when she was hired at Doctor At Home and met with Individual A, who is the husband of GUMILA and is the president of Doctor At Home, Individual A said that he had no interest in the tests that were ordered.

195.    Physician D also asked in the recorded October 2013 meeting whether Doctor At Home did the imaging tests that she was being asked to approve. Individual A and GUMILA said that there was another company they dealt with. Physician D then asked which doctors signed the tests. Individual A replied that that was an issue for the other company.

196.    In fact, records subpoenaed from the property management company managing the buildings where the **Subject Company Premises** and the **Subject Xpress Premises** are located show that Doctor At Home and Xpress Mobile Imaging are connected. Individual A, as the president of Doctor At Home, provided a guaranty for a company called Excella Healthcare to lease the **Subject Xpress Premises**, where Xpress Mobile Imaging's offices are located, according to an online Medicare provider database. According to a 2013 Comcast account name change authorization form that Xpress Mobile Imaging provided to Medicare, Excella Healthcare Inc. changed its Comcast account at that time so that its account would be known as Xpress Mobile Imaging Company.

197.    In addition, emails provided by Individual G show that the office where the employees in the Philippines is either run by or known as Excella. For example, in a June 20,

2013 email, GUMILA thanked the employees in the Philippines for working "very hard in the past year in the Excella in the PH" and for helping Doctor At Home "continue to grow." In a July 19, 2013 email, an employee wrote to GUMILA referring to Doctor At Home's website as inspiring her to apply for "the job opportunity here at Excella." A biller also sent GUMILA an email with photos of the "485 team," which show employees in the Philippines sitting in an office with a large sign celebrating the anniversary of Excella in the background.

198.    In addition, records for a Doctor At Home bank account at American Chartered Bank show that approximately $185,050 was transferred from Doctor At Home's account to another bank account in the name of Excella Healthcare.

## XII.    SUBJECT PREMISES

199.    Medicare regulations require providers to maintain complete and accurate medical records documenting each patient's need for the specific services provided to each patient. Records that Medicare requires to be maintained for physician services include patient histories, treatment notes, patient sign-in registries, physician orders, plan of care and certifications, admission and discharge records, prescriptions and notes for drugs or other medical supplies, and medical tests orders and results. Medicare requires these records are to be kept for up to seven years by the Medicare provider.

200.    According to a lease agreement provided by a property management company, Suburban Home Physicians leases Suites 112, 113A, and 113B at 830 E. Higgins Road, Schaumburg, Illinois (the **Subject Company Premises**). According to a floor plan provided by the property management company, the suites are connected and are accessible via multiple doors. According to surveillance of the Subject Company Premises and a review of the floor

plan, the entirety of the Subject Company Premises is accessible from the outside via a door labeled "113A." A sign outside that door reads "113A" on the first line and "Doctor At Home" on the second. The email signature lines for GUMILA and multiple nurses in the Philippines cite "830 E. Higgins Rd., Suite 113A, Schaumburg, IL" as their address.

201. According to an online Medicare provider database, Xpress Mobile Imaging is located at the **Subject Xpress Premises**. As described above in paragraphs 196 through 198, Xpress Mobile Imaging is connected to Doctor At Home via a guaranty, the Philippines office, and bank account transfers. In addition, according to Individual F, who left the company in 2013, said that she talked occasionally with the head biller for Doctor At Home and that the head biller has an office in the **Subject Xpress Premises**.

202. According to Secretary of State records, GUMILA's residence is at the **Subject Residence**. In the meeting recorded by Physician D in October 2013, Individual A said that GUMILA worked until 3 or 4 am every day and said that they had an office at their home. According to records provided by Doctor At Home's electronic-medical records provider, in 2014, GUMILA has logged into Doctor At Home's electronic-medical records system from an IP address which is assigned to Comcast. According to Comcast records, that IP address is assigned to GUMILA at the **Subject Residence**.

203. According to Individual H, who worked for Doctor At Home until late 2013, GUMILA worked from her home and monitors the office from her home. According to Individual H, GUMILA monitored employees via cameras in the office that transmitted to a computer at her home, and GUMILA sometimes called employees and asked why certain employees were not working. Consistent with this, GUMILA wrote in a June 27, 2013 email

60

that employees should be reminded that "we do have cameras in the office and it is being recorded 24 hours – 7 days a week."

204. Individual F and Individual G both said that GUMILA often sent them emails very late at night when each assumed she was working from home. In a June 26, 2013 email, GUMILA berated employees for not checking emails from home. "YOU CAN ALL READ YOUR EMAIL FROM HOME if you really care about your work and your job [b]ecause everyone has access to their email from HOME," she wrote.

205. According to interviews with employees, Doctor At Home uses computers at its office. Based on my training and experience, doctors' offices often maintain records related to patient files, billing, payroll and scheduling on computer systems located in the doctors' offices.

206. Investigating agents have conducted surveillance at the **Subject Company Premises** and the **Subject Xpress Premises**, which are part of an office complex and which are separated only by a sidewalk. Agents have seen vehicles bearing the Doctor At Home logo parked in a secure parking lot next to the building containing the **Subject Company Premises** and the **Subject Xpress Premises**. Investigating agents have also conducted surveillance at the **Subject Residence**. On the morning of July 24, 2014, an agent saw two vehicles parked outside the **Subject Residence**. One was registered in the name of GUMILA, and the other was registered in the name of Subject Home Physicians and GUMILA's husband, Individual A.

207. Based on my training and experience, as well as the evidence set forth above, the records to be seized in Attachment "B" are kept in the normal course of a health care provider's business at its offices, are likely to constitute evidence of the aforementioned violations, and are often kept on computers given the nature and volume of the records.

208.    In addition, the video surveillance system which GUMILA has referenced to in emails is likely to constitute evidence of the aforementioned violations.  For example, such video surveillance may confirm Individual F's account of Physician C signing Form 485's once a week without reviewing them (see paragraph 110 above).

## XIII.  SPECIFICS REGARDING SEARCHES OF COMPUTER SYSTEMS

209.    Based upon my training and experience, and the training and experience of specially trained computer personnel whom I have consulted, searches of evidence from computers commonly require agents to download or copy information from the computers and their components, or remove most or all computer items (computer hardware, computer software, and computer-related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment.  This is almost always true because of the following:

a.    Computer storage devices can store the equivalent of thousands of pages of information.  Especially when the user wants to conceal criminal evidence, he or she often stores it with deceptive file names.  This requires searching authorities to examine all the stored data to determine whether it is included in the warrant.  This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

b.    Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment.  The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the

62

system and its data. The search of a computer system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

        c.    In order to fully retrieve data from a computer system, the analyst needs all storage media as well as the computer. The analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard disk drives or on external media).

210.    In addition, a computer, its storage devices, peripherals, and Internet connection interface may be instrumentalities of the crime(s) and are subject to seizure as such if they contain contraband or were used to carry out criminal activity.

## XIV.   PROCEDURES TO BE FOLLOWED IN SEARCHING COMPUTERS

211.    The search and seizure warrant sought by this Application regarding the **Subject Premises** does not authorize the "seizure" of computers and related media within the meaning of Rule 41(c) of the Federal Rules of Criminal Procedure. Rather the warrant sought by this Application authorizes the removal of computers and related media so that they may be searched in a secure environment.

212.    With respect to the search of any computers or electronic storage devices seized from the location identified in Attachment A hereto, the search procedure of electronic data contained in any such computer may include the following techniques (the following is a non-

exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

        a.     examination of all of the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth herein;

        b.     searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

        c.     surveying various file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth herein;

        d.     opening or reading portions of files in order to determine whether their contents fall within the items to be seized as set forth herein;

        e.     scanning storage areas to discover data falling within the list of items to be seized as set forth herein, to possibly recover any such recently deleted data, and to search for and recover deliberately hidden files falling within the list of items to be seized; and/or

        f.     performing key word searches through all storage media to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment B.

213.    Any computer systems and electronic storage devices removed from the premises during the search will be returned to the premises within a reasonable period of time not to exceed 30 days, or unless otherwise ordered by the Court.

## XV.    SEIZURE FROM SUBJECT ACCOUNT

214.    According to an electronic funds agreement signed on behalf of Suburban Home Physicians d/b/a Doctor At Home, payments are made by Medicare into an account at American Chartered Bank in the name of Suburban Home Physicians and ending with the digits 8410 (the "**Subject Account**").

215.    Based on a review of bank records for this account, Medicare payments are made into the **Subject Account** almost every day.  I am also aware from my discussions with Medicare contractors and my training and experience that Medicare payments take several days to process and that Medicare contractors cannot stop payments after a certain point in the process.

216.    Title 18, United States Code, Sections 981(a)(1)(C) and 981(b) authorize civil forfeiture of funds derived from proceeds traceable to a violation of Title 18, United States Code, Section 1347.  In particular, Title 18, United States Code, Section 981(a)(1)(C) authorizes the seizure of property which constitutes or is derived from proceeds traceable to various offenses, including "any act or activity constituting an offense involving a Federal health care offense," as specified in Title 18, United States Code, Section 1956(C)(7)(F).

217.    In addition, Title 18, United States Code, Section 982(a)(7) authorizes the criminal forfeiture of property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to a Federal health care offense.  Title 18, United States

65

Code, Section 24(a)(1) defines "Federal health care offense" to include violations of 18 U.S.C. § 1347. The probable cause showing is the same for Sections 981(b) and 853(f), except that the latter also requires a showing that a restraining order "may not be sufficient to assure the availability of the property for forfeiture." Based on my training and experience, I know that restraining orders served on banks sometimes fail to preserve the property for forfeiture because the bank representative receiving the restraining order fails to put the necessary safeguards in place to freeze the money in time to prevent the account holder from accessing the funds electronically, or fails to notify the proper personnel as to the existence of the order, or the bank exercises its own right of setoff to satisfy an outstanding debt owed to the bank by the account holder. In contrast, where electronic funds are concerned, a seizure warrant guarantees that the funds will be in the Government's custody once the warrant is served.

218.    In this case, the deposits described above do not represent all of the activity in the **Subject Account**. To some extent, the deposits have been commingled with other funds deposited and withdrawn from the **Subject Account** over time. However, Title 18, United States Code, Section 984 permits the Government in a civil forfeiture action to forfeit fungible property, such as funds deposited in a bank account, without directly tracing the property if the funds are seized from the same account as the property involved in the offense, provided that the action is commenced within one year from the date of the offense. Specifically, according to the statute:

>    (a)(1)    In any forfeiture action in rem in which the subject property is cash, monetary instruments in bearer form, funds deposited in an account in a financial institution (as defined in section 20 of this title), or precious metals —

       (A)      it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture; and

       (B)      it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property.

   (2)      Except as provided in subsection (b), any identical property found in the same place or account as the property involved in the offense that is the basis for the forfeiture shall be subject to forfeiture under this section.

   (b)      No action pursuant to this section to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be commenced more than 1 year from the date of the offense.

18 U.S.C. § 984(a)-(b).

219. The Government anticipates that this seizure warrant will be signed on or before July 28, 2014. As such, the Government is limiting its request for authority to seize funds that equal the deposits resulting from the payments on the CPT code 99349 and 99350 claims described above, which funds were placed into the **Subject Account** between on or about August 1, 2013 and the present date. These funds may be seized because they were deposited within the one-year period authorized by 18 U.S.C. § 984.

220. According to an analysis of claims data, Medicare has paid at least approximately $436,878.45 on CPT 99349 claims with service dates of August 1, 2013 through May 30, 2014 and approximately $885,817.87 on CPT 99350 claims with service dates of August 1, 2013 through May 30, 2014, or $1,322,696.32 total. As discussed above, the vast majority of these established-patient visits are scheduled by the company not based on medically necessity but based on the company's scheduling policy, and most of these visits are routine in nature, rather than being as complicated as they are billed to Medicare. As discussed above in paragraph 154,

approximately 94 percent of the established-patient visits scheduled for that week were not scheduled in response to patient complaints, but as "follow up" visits as per Doctor At Home's policy.

221.    Based on the foregoing, I believe that there is probable cause to seize for forfeiture a total of funds not exceeding $1,190,426.69, representing 90 percent of the payments by Medicare to Doctor At Home on CPT 99349 and 99350 claims with service dates of August 1, 2013 through May 30, 2014, from the **Subject Account.**

## XVI.   CONCLUSION

222.    Based on the above information, I respectfully submit that there is probable cause to believe that beginning no later than 2011 and continuing until the present, DIANA JOCELYN GUMILA did knowingly and willfully participate in a scheme to defraud a health care benefit program, namely, Medicare, and to obtain, by means of false and fraudulent representations, money under the control of Medicare in connection with the delivery of or payment for health care services, and, in execution of the scheme, on or about July 24, 2013, did knowingly cause to be submitted a false claim, specifically, a claim that home health services provided to Patient ES qualified for payment because the patient was confined to the home, in violation of Title 18, United States Code, Section 1347

223.    I further submit that there is probable cause to believe that health care fraud offenses, in violation of Title 18, United States Code, Section 1347, have been committed, and that evidence of this criminal conduct, as further described in Attachment B, are located at the **Subject Premises.** By this affidavit and application, I request that the Court issue a search warrant allowing agents to seize the evidence described in Attachment B.

224.    I further submit that proceeds of this criminal conduct are located in the **Subject Account**.  By this affidavit and application, I request that the Court issue a seizure warrant allowing agents to seize funds not exceeding $1,190,426.69 from the **Subject Account**.  I further request that the Court authorize the effectuation of the seizure warrant by authorizing law enforcement officers to direct American Chartered Bank to do some or all of the following: (1) to freeze the contents of the **Subject Account** in place for up to 14 days from the issuance of the seizure warrant, and while the funds are frozen, to accrue any deposits, interest, dividends, and any other amount credited to the **Subject Account** until such time as the officer directs that the contents of the account be finally liquidated; or (2) to liquidate some or all of the contents of the **Subject Account** at one or more times while frozen, and upon any such liquidation to turn over to the officer the liquidated amount.

FURTHER AFFIANT SAYETH NOT.

_____
Forrest Johnson
Special Agent
Federal Bureau of Investigation

Subscribed and sworn
before me this 28th day of July, 2014

_____
Honorable YOUNG B. KIM
United States Magistrate Judge

69